FILED

2026 Jan-28  AM 09:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CONSUELA CUNNINGHAM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:24-cv-00664-AMM** |
| | ) | |
| **INTERNATIONAL** | ) | |
| **AUTOMOTIVE** | ) | |
| **COMPONENTS GROUP** | ) | |
| **NORTH AMERICA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case comes before the court on a motion for summary judgment filed by defendant International Automotive Components Group North America, Inc. ("IAC"). Docs. 26–28. The motion is fully briefed. Docs. 30–32. For the reasons explained below, the motion is **DENIED.**

### I.    BACKGROUND

IAC supplies automotive components and systems. *See* Doc. 27-7 at 7; Doc. 27-8 at 7. The Cottondale, Alabama facility manufactures car parts, such as interior door panels and overhead systems known as "headliners" for original equipment manufacturers such as Mercedes-Benz and Volkswagen. Doc. 27-7 at 7; Doc. 27-8

at 7. The facility is divided into departments categorized by the different parts that are produced. Doc. 27-7 at 7.

Plaintiff Consuela Cunningham began working at IAC's Cottondale facility in March 2022 through a staffing agency and was hired directly by IAC in August 2022. Doc. 27-1 at 10. She initially worked as a production operator on the automated molding line—the first step in manufacturing headliners. *Id.* at 11; Doc. 27-8 at 17 (explaining that "AML" stands for automated molding line); Doc. 27-7 at 11. Later, IAC promoted Ms. Cunningham to the position of master builder. Doc. 27-1 at 13, 18–19.

The master builder position requires in-depth knowledge of the automated molding line process and the ability to perform the job duties of all positions on the line, including training employees, addressing potential issues and/or bottlenecks, and filling in for absences or breaks. Doc. 27-1 at 14, 19–20; Doc. 27-4 at 87; Doc. 27-8 at 6, 13, 39–40. Given the nature of this position, the day-to-day responsibilities are not predictable. There are days that a master builder may be required to work in a production role for some or all of the shift; there are other times when the master builder may be responsible for ensuring efficient production and must pitch in where needed. Doc. 27-1 at 19–20; Doc. 27-8 at 6, 13, 39–40. The physical demands of the automated molding line process include repeatedly retrieving and maneuvering the headliners into and out of machinery throughout the workday. Doc. 27-1 at 11, 13,

15–16; Doc. 27-4 at 80–86; Doc. 27-8 at 22–23; Doc. 27-10 ¶ 5. At the start of production, headliners weigh approximately twenty-five to thirty pounds, but as components such as glue and fabric are added, the headliners get heavier, weighing between thirty-five and fifty pounds. Doc. 27-1 at 13–14; Doc. 27-7 at 19.

Ms. Cunningham learned that she was pregnant in early 2023. *See* Doc. 27-1 at 23. On April 10, 2023, she had a routine doctor's appointment to confirm that she was pregnant. *Id.* at 24. During this appointment, her doctor issued work-related restrictions because of the pregnancy. *Id.* at 24–25. These restrictions included "the flexibility to push fluid and have frequent bathroom breaks, to take appropriate breaks to elevate her legs as necessary, and to lift no more than 35 pounds, no frequent lifting and she may be able to sit down." Doc. 27-5 at 1; Doc. 27-1 at 26.

Ms. Cunningham brought a doctor's letter describing these restrictions to Amy Hart, a human resources employee at IAC. Doc. 27-1 at 25–26; Doc. 27-7 at 4, 30–31. According to Ms. Cunningham, Ms. Hart "told [Ms. Cunningham] that she was putting them in [Ms. Cunningham's] file." Doc. 27-1 at 26. Ms. Hart then requested clarification on the exact restrictions. Doc. 27-7 at 30–31. Ms. Cunningham subsequently submitted updated restrictions, requiring "flexibility . . . every 30 minutes to go to the restroom[,] . . . to sit down and elevate her legs every 2 1/2 hours for 20 minutes[,] . . . do not lift >30 pounds[,] no frequent lifting[,] . . . [and] to sit down on her breaks every 2 1/2 hours for 20 minutes when she elevates

3

her legs. She does not need to work over 40 hours per week." Doc. 27-7 at 100; Doc. 27-2 at 4; Doc. 27-8 at 26–27. This is where the undisputed facts end. The following details are contested.

On April 14, 2023, Ms. Hart met with Ms. Cunningham, along with safety manager Aimee Bell, to discuss the restrictions. Doc. 27-1 at 27–28. According to Ms. Cunningham, Ms. Hart said during the meeting, "[E]very time Brett . . . asks you to do something, you are complaining saying that . . . you can't do it because you're pregnant." *Id.* at 28. Ms. Hart allegedly said that if Ms. Cunningham could not get the restrictions lifted, she could not work at IAC because "pregnancy is not a disability." *Id.*

In her deposition, Ms. Cunningham unequivocally asserted that at no point during this conversation did she discuss any physical pain or cramping. *Id.* ("I never said anything to Amy . . . about no type of pain or anything like that."). Rather, she asserted that the conversation was an inquiry into why Ms. Cunningham was found sitting down during a shift. *Id.* But later in her deposition, Ms. Cunningham was shown some notes that she had taken regarding her conversation with Ms. Hart, and in the notes she stated, "Amy Hart did not know that I was hurting until she questioned me about why I was sitting down." *Id.* at 32. According to Ms. Cunningham, that note "refreshe[d] [her] memory" about a discussion between Ms. Cunningham and Ms. Hart about Ms. Cunningham's pain while performing the job.

*Id.* She later explained in her deposition that she had started cramping, so she sat down and that "[she] always cramp[s], so it could have been cramping from anything." Doc. 27-2 at 3; *see also* Doc. 27-5 at 7–8 ("Also I started cramping Friday so I sat down. It could [have] been from the lifting or it could've been me just cramping because I'm in my first trimester . . . .").

According to Ms. Hart, Ms. Cunningham said during their discussion, "Because as I'm working, it's causing me to cramp. . . . While I'm working, you know, I'm cramping, and this is why I have gone to my doctor and felt like there were problems." Doc. 27-7 at 36. So, Ms. Hart stated, "Well, you're verbalizing to me that it's causing you physical distress. I cannot let you go back to master builder." *Id.* Ms. Hart adamantly denies ever saying "Being pregnant is not a disability" or "You can't work here if you can't lift." *Id.* ("Absolutely not."). Ms. Hart explained during the meeting that Ms. Cunningham "could not be in the master builder position because of the work restrictions." Doc. 27-1 at 28.

According to Ms. Cunningham, Ms. Hart "was very adamant about getting the restrictions lifted." *Id.* Ms. Cunningham contends that Ms. Hart "basically told [Ms. Cunningham] what it was going to be, that was the restrictions removed or [Ms. Cunningham] can't work [at IAC]." *Id.* at 29. When asked if Ms. Hart meant that Ms. Cunningham could not work at IAC or could not work in the master builder position, Ms. Cunningham said, "Well that day, you could have took it either/or the

way she stated it." *Id.* But later in her deposition, Ms. Cunningham was asked "Ms. Hart clarified that [her comment] was with regard to your master builder position, correct?" and Ms. Cunningham replied, "Yeah. She stated that in the messages." Doc. 27-2 at 3; *see also* Doc. 27-1 at 30 ("And so during that conversation with Ms. Hart, she clarified that you would not be able to work in the master builder position with work restrictions, but not that you would not be able to work at IAC with work restrictions, right?" "Yes.").

Ms. Cunningham then contacted her doctor's office to see if she could get the restrictions lifted, but the doctor refused to lift the restrictions. Doc. 27-1 at 30. So Ms. Cunningham sent a text to Ms. Hart, explaining that the restrictions would not be removed. Doc. 27-7 at 103. Ms. Hart responded, "You will not be able to work in the position that you were in with restrictions. . . . I can offer you an operator position where there is no lifting. But, otherwise you can not go to the floor in the same position." *Id.* Ms. Cunningham indicated that she wanted to talk to the human resources manager and asked for his email address. *Id.* at 104. Ms. Hart replied, "You stated that doing the job interferes with the restrictions and caused you to cramp. We have no choice but to move you to another position that will not interfere with the restrictions." *Id.* Ms. Hart then provided the human resources manager's email address. *Id.* at 105.

The operator position that Ms. Hart offered was one that could accommodate Ms. Cunningham's restrictions. *Id.* at 34–35; Doc. 27-8 at 40. Ms. Hart knew of the available door line operator position because there is a "kind of a roster or staffing" that Ms. Hart "updated . . . every single day." Doc. 27-7 at 37. The door line operator role involves an automated carousel that moves the door frame to each workstation where operators install components onto the frame. *Id.* at 33; Doc. 27-8 at 19. The door line operator position does not require any lifting, and Ms. Cunningham's other restrictions could be accommodated. Doc. 27-7 at 34–35; Doc. 27-8 at 40. IAC asserts that "[t]he offered operator position did not involve a reduction in pay, change in shift, or loss of benefits." Doc. 28 ¶ 38. But Ms. Hart testified that "any job pays less than a master builder," so "[Ms. Cunningham] may have had to take a pay reduction; she may not have." Doc. 27-7 at 33. "That would have actually been something that, once the decision had been made to move her, [Ms. Hart] would have had with Steve [Dorsett]." *Id.* "[They] did not get to that point." *Id.* Ms. Cunningham did not respond to Ms. Hart's offer of the operator position "[b]ecause [Ms. Cunningham] wanted to speak with Mr. Steve Dorsett," IAC's human resources manager. Doc. 27-1 at 30; Doc. 27-10 ¶ 1.

According to Ms. Hart, at some time around these events, Ms. Hart "told [Ms. Cunningham] that [IAC] could give her a position in something that there's no lifting, and that would primarily be door line." Doc. 27-7 at 33. Ms. Hart contends

that she said, "I can get you a position on the door line," and Ms. Cunningham said, "No." *Id.*; *see also id.* at 34 ("[A]re you sure you specifically said the door line, or you just said, 'I can find you a position in production?'" "No. I specifically said door line . . . ."). Though, Ms. Hart explains that no one was present when she had these conversations with Ms. Cunningham, and she cannot remember exactly when they took place. *Id.* at 33–34. Further, she acknowledges that "there's nothing in writing that says [Ms. Hart] offered her the door job." *Id.* at 36; *see also id.* at 40 ("[B]ut you think you told her that orally? 'You can go on the door line.'" "Yes. Verbally . . . .").

Ms. Hart also admits that she "did [not] try to work with [Ms. Cunningham] on the master builder job and try to figure out if there was a way she could do that." *Id.* at 41. Ms. Hart just concluded that due to the restrictions on frequent lifting and lifting greater than thirty pounds, Ms. Cunningham could not do the essential functions of the master builder job even with accommodations. *Id.* at 31. Ms. Hart contends that during the meeting with Ms. Cunningham, Ms. Cunningham "asked could we hire somebody to do the lifting . . . [o]r move someone into the position." *Id.* at 41. "She actually didn't ask. She said, 'You can just hire somebody or move somebody in that position to do the lifting part of it.'" *Id.* Ms. Cunningham disagrees. She states that she "never asked her for any type of help." Doc. 27-1 at 29.

On April 16, 2023, Ms. Cunningham sent Mr. Dorsett an extensive email stating, "I feel I'm a victim of discrimination." Doc. 27-5 at 7. Ms. Cunningham included a detailed description of her version of the events. *Id.* at 7–8. She once again claimed that Ms. Hart had said, "Conseula if you can't lift, you can't work here" and that "being pregnant is not a disability." *Id.* at 7.

Ms. Cunningham then had a meeting on April 17, 2023, with Mr. Dorsett. Doc. 27-1 at 31. During this meeting, Ms. Cunningham claims to have said, "I would love to stay in master builder, but if I need to be moved, I'm happy with moving, because I just need a job." Doc. 27-2 at 3. He told Ms. Cunningham to get more detailed restrictions so IAC could better accommodate her. *Id.* at 4. She did so, and Mr. Dorsett said "I've got to give this to the lawyers and just go back to the floor and do what you normally do. And whenever the lawyers reach back out to me, I will get in touch with you." *Id.*

Ms. Cunningham worked a full shift and then received "a phone call from Tracee Taylor telling [Ms. Cunningham] there was nothing that they could do to accommodate [her], and they encouraged [Ms. Cunningham] to use short-term disability." *Id.* at 5. Ms. Cunningham asked Ms. Taylor what specifically IAC could not accommodate, but Ms. Taylor said "they already discussed what they could do," though she never clarified who "they" was. *Id.* Later that evening, Ms. Cunningham texted Ms. Taylor and said, "I'm just wondering why I couldn't be moved

somewhere else? . . . I'm almost certain that my restrictions would've not got in the way of me being moved to Quality until my pregnancy was over." Doc. 27-9 at 35. Ms. Taylor never responded substantively because "at this point in [her] position as HR generalist, it was not [her] place to respond to [Ms. Cunningham] about this issue" after Ms. Hart had "already had conversations . . . about what could have been done for her situation." *Id.* at 8. Ms. Taylor brought the message to Ms. Hart's attention. *Id.* Ms. Cunningham admits that she "never . . . followed up with Ms. Hart about the operator position" that Ms. Hart had referenced. Doc. 27-2 at 6.

Mr. Dorsett contends that in the wake of his meeting with Ms. Cunningham, he "tested [Ms. Cunningham's allegations] against what Amy had and what she showed [Mr. Dorsett]." Doc. 27-8 at 15–16. "Based off of the facts that [he] had seen at that point, [he] was not able to see anything that pointed toward any type of what [he] considered discrimination . . . ." *Id.* at 16. Mr. Dorsett "felt that [the situation] was shallow enough that it showed itself easy enough without having to go further." *Id.* at 17.

Ms. Cunningham applied for short-term disability on April 20, 2023, but her application was denied by IAC's third-party provider. Doc. 27-2 at 7; Doc. 27-5 at 11–12. Ms. Cunningham then reapplied and was approved for short-term disability benefits from October 5 to December 11, 2023. Doc. 27-5 at 15. On December 18, Ms. Cunningham was cleared to return to work by her physician. Doc. 27-2 at 8.

10

When IAC operations resumed on January 3, 2024, IAC reinstated Ms. Cunningham to her master builder position on the same shift. *Id.* at 9.

On May 24, 2024, Ms. Cunningham filed a complaint against IAC, including two counts: (1) Count I – Sex/Pregnancy Discrimination in Violation of Title VII and (2) Count II – Retaliation in Violation of Title VII. Doc. 1 at 5–6. IAC moved for summary judgment, arguing that Ms. Cunningham did not have sufficient direct or circumstantial evidence of discrimination. Docs. 26–28.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the moving party has carried its burden, Rule 56 requires that the nonmoving party "go beyond the pleadings" and establish that there is a material fact in genuine dispute. *Celotex*, 477 U.S. at 324–25; *see also* Fed. R. Civ. P. 56(c)(1)(A). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus*, *LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute if a reasonable jury could return a verdict in favor of the nonmoving party. *Id*.

11

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. "The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323.

## III.   DISCUSSION

Summary judgment is not appropriate based on the record before the court. The Eleventh Circuit has admonished that "summary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by

summary judgment." *Furcron*, 843 F.3d at 1303 (cleaned up). "Where a fact-finder is required to weigh a deponent's credibility, summary judgment is simply improper." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1162 (11th Cir. 2012). "Summary judgment operates as a judicial safety-valve, permitting the court to decide a case as a matter of law only where there are no genuine issues of material fact that are relevant to the parties' dispute . . . ." *Id.* "[I]t does not permit, however, the court to make a final determination where such genuine issues of material fact exist." *Id.*

As the foregoing factual narrative makes clear, the parties do not agree on the material facts. The parties do not agree that the master builder position involves frequent lifting or that lifting was an essential part of the position. *Compare* Doc. 28 ¶ 30 ("IAC determined that the Master Builder position could not be modified to meet [Ms. Cunningham's] restrictions because it required elimination of an essential function of the Master Builder position, which was the ability to lift the headliner when needed."), *with* Doc. 27-1 at 25 ("Like, because like I said, with the master builder position, you didn't really have to lift anything. Because like I said, I was a problem solver."). The parties do not agree on the contents of conversations that allegedly took place. *Compare* Doc. 27-5 at 7 ("Amy Hart stated that . . . 'You can't work here if you can't lift' . . . ."), *with* Doc. 27-7 at 36 ("Absolutely not."). The parties cannot agree on whether Ms. Hart said certain things to Ms. Cunningham

about her pregnancy, *compare* Doc. 27-5 at 7 ("Amy Hart stated that 'being pregnant is not a disability' . . . ."), *with* Doc. 27-7 at 36 ("Absolutely not."), nor can the parties agree on whether Ms. Hart offered Ms. Cunningham an alternative job or whether Ms. Cunningham declined the position, *compare* Doc. 27-2 at 33 (testifying that Ms. Hart offered Ms. Cunningham a job and she said, "No."), *with* Doc. 27-7 at 3 ("No, ma'am. I never rejected any position at all."), *and* Doc. 30 ¶ 26 ("[Ms. Cunningham] disputes that [Ms.] Hart made this [reassignment] offer."). In short, the factual record is rife with hotly disputed facts. And this court declines to invade the province of the jury in weighing the credibility and veracity of these allegations.

## IV.    CONCLUSION

Because there are genuine disputes of material fact, the court **DENIES** IAC's motion for summary judgment.

**DONE** and **ORDERED** this 28th day of January, 2026.



**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE